# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| ELIZABETH HARDY, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-18-3869 |
| | § | |
| OPREX SURGERY (BAYTOWN) L.P. | § | |
| d/b/a ALTUS BAYTOWN HOSPITAL; | § | |
| ZT WEALTH, LLC d/b/a ZT CORPORATE, | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is defendants' Oprex Surgery (Baytown) L.P. d/b/a Altus Baytown Hospital ("Altus Baytown") and ZT Wealth, LLC d/b/a ZT Corporate ("ZT Wealth") motion for summary judgment. Dkt. 36. Plaintiff Elizabeth Hardy responded twice. Dkts. 37, 49.[1] Defendants replied twice. Dkts. 38, [2] [3] 51. After reviewing the motion, responses, reply, relevant evidence, and applicable law, the court is of the opinion that the motion should be GRANTED in part and DENIED in part.

---

[1] The court **GRANTS** Hardy's motion to file supplemental briefing (Dkt. 48), and Altus Baytown's request to reply (Dkt. 50).

[2] Altus Baytown also moves to strike as untimely Exhibit G to Hardy's response, an expert report from Mr. James O. Whitehead III. Dkt. 38 at 10-11. Hardy properly designated Whitehead as an expert witness (Dkt. 13) and provided a copy of Whitehead's initial expert report to Altus Baytown at that time (Dkt. 13-3). Under Federal Rule of Civil Procedure 26, Hardy must supplement this report no later than 30 days prior to trial. Fed. R. Civ. P. 26(a)(3)(B). Hardy filed her response on January 29, 2020. Dkt. 37. At that time, trial was set for April 24, 2020. Dkt. 15. Therefore, Whitehead's amended expert report was timely and Altus Baytown's motion to strike (Dkt. 38) is **DENIED**.

[3] Similarly, Hardy moves to strike Altus Baytown's reply because it is both untimely and exceeds the court's page limit. Dkt. 39. Altus Baytown's reply was due on February 3, 2020, but was not filed until February 5, 2020. The reply also exceeds the court's five-page limit. However, Hardy provides no evidence of prejudice if the court were to consider Altus Baytown's reply (especially after permitting Hardy's supplemental briefing, *see supra* note 1), whereas striking the reply would prejudice Altus Baytown. Hardy's motion (Dkt. 39) is **DENIED**.

Nonetheless, Altus Baytown is reminded to carefully read and abide by the court's procedures before it files any further briefing or appears before this court.

# I. BACKGROUND

This case is about Altus Baytown's termination of Hardy's employment.  Altus Baytown operates a hospital in Baytown, Texas.  Dkt. 36 at 8.  On March 21, 2016, Altus Baytown hired Hardy to be its Director of Quality, Risk Management, and Case Management.  Dkt. 37 at 5-6. Hardy was responsible for maintaining the overall quality and safety of Altus Baytown's operations and reported to Molly McComas, Altus Baytown's Administrator and Chief Nursing Officer.  *Id.* at 6.

Among her many duties, Hardy was responsible for maintaining Altus Baytown's accreditations with third party accrediting bodies, such as Det Norske Veritas ("DNV").  Dkt. 36 at 9.  DNV accreditation involves collecting data and submitting reports to DNV, as well as documenting and addressing DNV survey deficiencies in a Corrective Action Plan ("CAP").  *Id.* As Director of Quality, Hardy was primarily responsible for compiling and submitting DNV surveys and CAPs.  *Id.*

Sometime in or before September 2016, Hardy was diagnosed with a degenerative joint disease that required arthroscopic hip surgery, which Hardy underwent on November 14, 2016 (the "First Scope").  *Id.* at 10-11; Dkt. 37 at 7.  Hardy would undergo two additional procedures to treat her hip disease while an Altus Baytown employee: a second hip arthroscopy in May 2017 (the "Second Scope"); and a full hip replacement on November 16, 2017.  Dkt. 36 at 13-15; Dkt. 37 at 10-11.

Prior to the First Scope on November 14, 2016, Hardy requested only five days off work, November 14-18, 2016, despite her doctor's advice that her recovery period be at least three weeks. Dkt. 36 at 11; Dkt. 37 at 8.  She returned to work on November 21, 2016, after availing herself of her full requested time off.  Dkt. 36 at 11.  Altus Baytown did not require Hardy to return to work

on November 21, 2016, nor any other specific date.  *Id.*  However, Hardy repeatedly reached out to Altus Baytown employees to discuss work matters during her time recuperating from the First Scope.  *Id.*  Hardy again requested only a few days off prior to her Second Scope.  *Id.*  at 13 ("On May 8, 2017, Hardy emailed McComas about her upcoming hip surgery and notified McComas that she would be using two days of PTO on May 12 and May 15.").  When Altus Baytown encouraged Hardy to take her time recovering, Hardy replied that she would rather use her PTO for "fun stuff," like vacationing.  *Id.*

In anticipation of her hip replacement surgery, Hardy contacted Altus Baytown's HR department in November 2017 about any available short-term disability benefits and taking leave under the Family Medical Leave Act ("FMLA").  *Id.* at 14-15.  Hardy went on FMLA leave between November 16, 2017, and December 4, 2017.  *Id.* at 14-15; Dkt. 37 at 11.  These were the exact dates Hardy requested prior to her hip replacement.  Dkt. 36 at 14-15.  Because she "realiz[ed] her work was again piling up," and felt "the responsibilities of [her] duties fell squarely on her shoulder[s]," Hardy returned to work on December 5, 2017, the date she said she would return prior to undergoing surgery.  Dkt. 37 at 11-12; *see also* Dkt. 36 at 14-15.  Altus Baytown again did not require her to return to work on a specific date nor prior to being medically released to return.  Dkt. 36 at 15.

Hardy used crutches to get around for six weeks after each scope and was unable to work for approximately two weeks after her hip replacement.  Dkt. 37 at 8, 10-11.  To ease her workload during each recovery period, Hardy requested that Altus Baytown hire a direct report, or train an existing employee, to assist Hardy.  *Id.*  Hardy was not always the only Quality employee at Altus Baytown.  When Hardy was hired as Director of Quality, Altus Baytown also employed a Quality Manager, Rhonda Selman.  Dkt. 37 at 10.  Selman reported directly to Hardy until Selman resigned

in September 2016.  *Id.* at 6.  Altus Baytown did not hire a replacement for Selman in September 2016 because of budgetary limitations, and denied Hardy's requests to fill a similar position after each procedure.  Dkt. 36 at 10; Dkt. 37 at 8-11.  Nonetheless, Altus Baytown employees repeatedly accepted delegated tasks from Hardy throughout her time as Director of Quality.  Dkt. 36 at 10.

Hardy also requested to work from home while she recovered from her Second Scope, which Altus Baytown denied.  Dkt. 37 at 10.  However nearly one year prior, Altus Baytown had already provided Hardy remote access so she could work from home when needed.  Dkt. 36 at 9-10.

In addition to denying these requests, Hardy claims McComas treated her "differently," "grew increasingly hostile towards her," and "would ignore her emails, calendar invites, and meeting requests," after each procedure.  Dkt. 37 at 9, 11-12.  Specifically, Hardy was not invited to the Altus Foundation Gala in December 2016 or December 2017 despite other members of Altus Baytown's leadership team receiving invitations.  *Id.* at 9, 12.  Notably, the Director of Quality at Altus Houston Hospital, Altus Baytown's sister hospital, also was not invited.  Dkt. 36 at 12.

Despite this harsh treatment, Altus Baytown continued to praise Hardy for her performance.  Hardy's performance evaluations were glowing in Summer 2016 and Spring 2017. Dkt. 37 at 6-7, 10.  But in April 2017, Altus Baytown did note Hardy's communication skills needed improvement and emphasized that a successful DNV survey was a crucial priority.  Dkt. 36 at 13.  These concerns ripened in Hardy's 2018 evaluation, which noted Hardy had become "ineffective" and resulted in her being placed on a work improvement plan in April 2018.  *Id.* at 16.  Despite McComas's repeated attempts, Hardy never scheduled a meeting to discuss and implement the work improvement plan.  *Id.*

April 2018 was a busy month for Hardy.  DNV conducted its annual accreditation survey on April 9, 2018, and issued a deficient finding to Altus Baytown. Dkt. 37 at 13.  Altus Baytown needed to submit its CAP on or before May 4, 2018.  *Id.* at 15.  As Director of Quality, Hardy was particularly responsible for preparing and submitting the CAP.  Dkt. 36 at 9.

That same month on April 27, 2018, Hardy contacted Altus Baytown's legal department to report a possible HIPAA violation by McComas.  *Id.* at 17; Dkt. 37 at 14.  Altus Baytown initiated an investigation into Hardy's report on May 1, 2018.  Dkt. 37 at 14.  Hardy was formally interviewed for the investigation on May 7, 2018.  *Id.* at 18.

Hardy continued to prepare the CAP submission throughout April 2018 with input from McComas and other Altus Baytown employees.  *Id.* at 15.  Late on the afternoon of May 4, 2018, McComas gave Hardy final approval to submit the CAP to DNV via email.  Dkt 36 at 18; Dkt. 37 at 16.  DNV received the CAP on May 6, 2018—two days after the May 4 due date.  Dkt. 36 at 19; Dkt. 37 at 17.  The parties dispute what transpired over those two days.

According to Hardy, she sent the email with the CAP attached to DNV on May 4, 2018, but the file was stuck in Altus Baytown's email servers until May 6, 2018, when it was finally delivered to DNV.  Dkt. 37 at 16-17; Dkt. 37-8 (expert report concluding the same).  Altus Baytown, however, maintains that Hardy sent the email on May 6, 2018, and when McComas questioned Hardy about the seemingly late timestamp, Hardy forwarded an altered email displaying a May 4, 2020 timestamp.  Dkt. 36 at 18-20; Dkt. 36-5 (declaration of Altus Baytown's IT manager concluding the same).

Believing Hardy had missed the CAP deadline then subsequently lied about it, Altus Baytown terminated Hardy on May 8, 2018.  *Id.* at 20.

Hardy filed suit against Altus Baytown and ZT Wealth on October 17, 2018.  Dkt. 1.  She claims Altus Baytown violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12101, et seq., when it (1) terminated her because of her disability; and (2) failed to accommodate her disability.  She also alleges interference and retaliation under the FMLA, 29 U.S.C. 2611, et seq.  Finally, she asserts a retaliation claim under Texas Health and Safety Code section 161.134 ("§161.134") for reporting a potential HIPAA.  According to Hardy, ZT Wealth is equally liable for these violations because (1) it is the alter ego of Altus Baytown; and (2) both defendants should be considered a single employer under the law.

## II. Legal Standard

A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Klocke v. Watson*, 936 F.3d 240, 246 (5th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)).  "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party."  *Fordoche, Inc. v. Texaco, Inc.*, 436 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2540 (1986).  If the moving party meets its burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial.  Fed. R. Civ. P. 56(e).  "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim."  *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th

Cir. 1998).  "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).  However, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant.  *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008).

## III. ANALYSIS

### A. ZT Wealth's Liability

The court will first address Defendants' final argument: ZT Wealth is not a proper defendant to this suit because it is a wealth management limited liability company that never employed Hardy.  *See* Dkt. 36 at 29-31.  Hardy brings claims under each of the ADA, FMLA, and Texas Health and Safety Code.  Each statute applies to different entities, and Defendants argue that ZT Wealth is not within the scope of any of them.  Hardy disputes Defendants' position and further argues that ZT Wealth is equally liable because it is nothing more than an alter ego of Altus Baytown.  Dkt. 37 at 36.

#### 1. *Alter Ego Liability*

Alter ego liability has been extended to Title VII employment discrimination claims.  *See Trevino v. Celanese Corp.*, 701 F.2d 397 (5th Cir. 1983).  But Hardy has not brought a Title VII claim.  *See* Dkt. 1.  Assuming without deciding that alter ego liability also applies to claims under the ADA, FMLA, and Texas Health & Safety Code, Hardy fails to produce sufficient evidence to allow a reasonable jury to make such a conclusion.

Hardy assets that Defendants share common employees and are part of the same umbrella of companies.  Dkt. 37 at 35-36.  The court considers four factors when determining if a parent and its subsidiary should be liable for employment discrimination: (1) interrelation of operations,

(2) centralized control of labor or employment decisions, (3) common management, and (4) common ownership or financial control. *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 777 (5th Cir. 1997). However, "the mere existence of common management and ownership are not sufficient to justify treating a parent corporation and its subsidiary as a single employer." *Id.* at 778. There must also be "[s]ome nexus to the subsidiary's daily employment decisions." *Id.* Hardy produces no evidence that ZT Wealth was involved in Altus Baytown's "daily employment decisions" let alone the decision to terminate her. Therefore, ZT Wealth cannot be liable under an alter ego theory.

2. *ADA Liability*

The ADA prohibits any "covered entity" from discriminating against an employee because of her disability. *See* 45 U.S.C. § 12112(a). "Covered entity" is further defined as "an employer, employment agency, labor organization, or joint labor-management committee." *Id.* § 12111(2). An employee is "an individual employed by an employer." *Id.* § 12111(4). ZT Wealth never employed Hardy. Dkt. 36-8 at 3. Therefore, Hardy cannot bring a claim under the ADA against ZT Wealth.

3. *FMLA Liability*

The FMLA applies to any employer "who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year." 29 C.F.R. § 825.104(a). ZT Wealth does not employ 50 or more employees. Dkt 36-8 at 2. But Hardy argues that Defendants should be considered a single FMLA employer under the "single integrated employer" test. Dkt. 37 at 36.

"Separate entities will be deemed to be parts of a single employer for purposes of FMLA if they meet the integrated employer test," which "is not determined by the application of any

single criterion, but rather the entire relationship is to be reviewed in its totality."  29 C.F.R. §

825.104(c)(2).  "Factors considered in determining whether two or more entities are an integrated

employer include: (i) [c]ommon management; (ii) [i]nterrelation between operations; (iii)

[c]entralized control of labor relations; and (iv) [d]egree of common ownership/financial control."

*Id.*  These factors closely mirror the *Lusk* factors discussed above.  *See Lusk*, 129 F.3d at 777.

Again, Hardy has offered no evidence that ZT Wealth directed Altus Baytown's daily

employment decisions, and evidence of common employees and common ownership cannot alone

support a finding of a single integrated employer.  *See id.* at 778.  Therefore, ZT Wealth and Altus

Baytown cannot be considered a single integrated employer under the FMLA.

### 4. *Texas Health & Safety Code Liability*

Finally, Altus Baytown asserts that ZT Wealth cannot be liable under § 161.134 because it

is not a "hospital, mental health facility, or treatment facility."  Dkt 36 at 30 (quoting Tex. Health

& Safety Code § 161.134(a)).  Hardy offers no evidence that demonstrates ZT Wealth is in fact a

hospital, mental health facility, or treatment facility, but instead asserts that it should be held liable

nonetheless because it exercises exorbitant control over Altus Baytown. Dkt 37 at 37.  As a wealth

management limited liability company, ZT Wealth does not fall within the definition of hospital,

mental health facility, or treatment facility.  *Id.*; *see also* Tex. Health & Safety Code §§ 161.134(a),

241.003, 464.001, 571.003.  Therefore, ZT Wealth cannot be held liable under § 161.134.

After examining the framework of each relevant statute, ZT Wealth cannot be directly

liable under any of the ADA, FMLA, or § 161.134.  Nor can ZT Wealth be held liable as an alter

ego of Altus Baytown.  Therefore, summary judgment is appropriate for ZT Wealth on all of

Hardy's claims.

A. <u>Americans with Disabilities Act</u>

    1. *Failure to Accommodate*

The ADA prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability … unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A). "Thus, a plaintiff must prove the following statutory elements to prevail in a failure-to-accommodate claim: (1) the plaintiff is a 'qualified individual with a disability;' (2) the disability and its consequential limitations were 'known' by the covered employer; and (3) the employer failed to make 'reasonable accommodations' for such known limitations." *Amedee v. Shell Chem., L.P.*, 953 F.3d 831, 837 (5th Cir. 2020) (quoting *Feist v. La., Dep't of Justice, Office of the Attorney Gen.*, 730 F.3d 450, 452 (5th Cir. 2013).

The court need go no further than the first element to find a factual issue. Under the ADA, a disability is a "physical or mental impairment that substantially limits one or more of the major life activities of an individual." 29 C.F.R. 1630.2(g)(1)(i). Hardy asserts that her hip disease and related surgery recoveries created a disability under the law because it affected her ability walk and work, which are both "major life activities." *See id.* at 1630.2(i)(1)(i) (defining major life activities as, among other things, walking and working). But Altus Baytown argues Hardy's impairment was "temporary," and does not qualify as a disability. Yet this question must be resolved by a jury, because "[t]he effects of an impairment lasting or expected to last fewer than six months can be substantially limiting." *Id.* at 1630.2(j)(1)(ix).

The evidence presented raises similar issues as to whether Altus Baytown "knew" of Hardy's limitations and if Hardy's requested accommodations were "reasonable." Therefore, summary judgment is not appropriate on Hardy's failure to accommodate claim.

2. *Discriminatory Discharge*

The ADA also prohibits employers from discharging an employee because of her disability. 42 U.S.C. § 12112. "In a discriminatory-termination action under the ADA, the employee may either present direct evidence that she was discriminated against because of her disability or alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973)." *Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 764 (5th Cir. 2016).

Under *McDonnell Douglas*, Hardy must prove (1) she had a disability, (2) she was qualified for the job, and (3) there was a causal connection between an adverse employment action and her disability. *Id.* at 765. If Hardy meets this burden, Altus Baytown can rebut the presumption of discrimination by articulating legitimate business reasons for the adverse action. *Id.* Finally, if Altus Baytown provides a legitimate reason, Hardy must offer evidence to show that reason was pretext for discrimination. *Id.*

As discussed above, the questions of whether Hardy has a disability remains a genuine issue of material fact. But assuming Hardy can make her *prima facie* case, Altus Baytown can still prevail on summary judgment if it articulates a legitimate business reason for terminating Hardy and if Hardy fails to provide evidence to show that reason is merely pretext. *See id.*

Altus Baytown claims Hardy's termination was due to her deteriorating performance, failure to timely submit the DNV CAP report, and the belief that Hardy subsequently lied about when the CAP was submitted. Dkt. 36 at 20. These are legitimate business reasons, and Altus

11

Baytown's evidence supports its position.  *See* Dkt. 36-5, Liu Decl. (explaining Altus Baytown's internal investigation and that of its external IT vendor, both of which concluded Hardy sent the CAP on May 6 and subsequently altered her email proof).

In discrimination cases "the [pretext] inquiry is limited to whether the employer believed the allegation in good faith and whether the decision to discharge the employee was based on that belief." *Waggoner v. City of Garland*, 987 F.2d 1160, 1165–66 (5th Cir. 1993).  Hardy's pretext evidence essentially refutes Altus Baytown's conclusions as objectively false.  Dkt. 37-8.  However, Hardy has not provided evidence upon which a reasonable jury could conclude Altus Baytown's beliefs at the time of Hardy's termination were in bad faith.  Therefore, summary judgment in favor of Altus Baytown is appropriate on Hardy's ADA discrimination claim.  *See Waggoner*, 987 F.2d at 1165-66.

B.  Family Medical Leave Act

The FMLA grants "an eligible employee" up to twelve weeks of annual unpaid leave for "a serious health condition" that prevents him from performing the functions of his job.  *See* 29 U.S.C. § 2612(a)(1)(D).  The FMLA prohibits employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise or the attempt to exercise, any right provided under" the Act. *Id.* § 2615(a)(1).  The FMLA also prohibits employers from "discharg[ing] or in any other manner discriminat[ing] against an individual for opposing any practice made unlawful" by the Act. *Id.* § 2615(a)(2).

1.  *FMLA Interference*

"To make a prima facie case of interference, a plaintiff must demonstrate that (1) he was an eligible employee; (2) his employer was subject to FMLA requirements; (3) he was entitled to leave; (4) he gave proper notice of his intention to take FMLA leave; and (5) his employer denied

him the benefits to which he was entitled under the FMLA." *Tatum v. S. Co. Servs., Inc.*, 930 F.3d 709, 713 (5th Cir. 2019) (citing *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017)).

"As with the ADA, however, even if the plaintiff makes out a prima facie case, he may not overcome a motion for summary judgment if the employer articulates a legitimate non-discriminatory reason for the employment action at issue." *Caldwell*, 850 F.3d at 245 (citing *Miller v. Metrocare Servs.*, 809 F.3d 827, 832 (5th Cir. 2016). To prevail in such a case, the plaintiff must raise an issue of material fact that the employer's proffered reason was pretextual. *Miller v. Metrocare Servs.*, 809 F.3d at 832.

Hardy gave notice of her intention to take FMLA leave for her hip replacement surgery in November 2017 but not for either scopes. Thus, only the circumstances of Hardy's hip replacement leave may be considered for her interference claim. Dkt 36 at 10-15; Dkt. 37 at 7-12.

Hardy requested FMLA leave between November 16 and December 4, and Altus Baytown permitted her to take that entire time off work. *Id.* Hardy offers no evidence that Altus Baytown forced her to return to work earlier than she requested or do anything else to "den[y her] the benefits to which [s]he was entitled under the FMLA. *Tatum*, 930 F.3d at 713. Therefore, Hardy fails to make a *prima facie* case for FMLA interference, and summary judgment in favor of Altus Baytown is appropriate on Hardy's FMLA interference claim.

2. *FMLA Retaliation*

"[A] prima facie case of retaliatory discharge [under the FMLA] requires that an employee show (1) he engaged in a protected activity, (2) the employer discharged him, and (3) there is a causal link between the protected activity and the discharge." *Tatum*, 930 F.3d at 713.

When there is no direct evidence of discriminatory intent, the *McDonnell Douglas* framework also applies to determine the reason for an employee's discharge under the FMLA. *Id.*

13

(citing *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005))  Once an employee presents a prima facie case of retaliation, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action."  *Richardson*, 434 F.3d at 332.  If a nondiscriminatory reason is proven, "the burden shifts back to the employee to show by a preponderance of the evidence that the employer's articulated reason is a pretext for discrimination."  *Id.* at 332–33.

But similar to above, the pretext inquiry "is not whether [Altus Baytown] was objectively correct about [Hardy]'s dishonesty, but whether it had a good-faith belief that dishonesty existed, and that such belief was the basis for the termination."  *DeVoss v. Sw. Airlines Co.*, 903 F.3d 487, 492 (5th Cir. 2018) (citing *Waggoner*, 987 F.2d at 1165–66).  Assuming Hardy has shown a *prima facie* case, Altus Baytown's stated reason for terminating Hardy is legitimate and Hardy's pretext evidence is insufficient.  Therefore, summary judgment in favor of Altus Baytown is appropriate on Hardy's FMLA retaliation claim.

C.  <u>Texas Health and Safety Code § 161.134</u>

§ 161.134 forbids a "hospital, mental health facility, or treatment facility" from "suspend[ing] or terminat[ing] the employment of or disciplin[ing] or otherwise discriminat[ing] against an employee for reporting … a violation of law." Tex. Health & Safety Code § 161.134(a). While the plaintiff bears the burden of proving her termination was on account of reporting a violation of law, there is "a rebuttable presumption that the plaintiff's employment was suspended or terminated … for making a report related to a violation if the suspension, termination, discipline, or discrimination occur[ed] before the 60th day after the date on which the plaintiff made a report in good faith."  *Id.* § 161.134(f).

Here, Hardy reported a HIPAA violation in good faith on April 27, 2018, then was terminated 11 days later, on May 8, 2018. Dkt 36 at 17, 20. Nonetheless, Altus Baytown maintains that Hardy was terminated for deficient performance and the DNV CAP incident. These reasons are sufficient to overcome any presumption under § 161.134. Hardy's only other evidence that she was terminated for reporting a HIPAA violation is that McComas mentioned terminating Hardy during her statement to Altus Baytown's HIPAA compliance investigator. Dkt. 37 at 30-32. This statement is consistent with the fact that Hardy had received a poor evaluation and refused to engage in the work improvement plan on which she had been placed a few weeks prior. Dkt. 36 at 16. This evidence is insufficient to create a genuine issue of material fact that a reasonable jury could resolve in Hardy's favor. Therefore, summary judgment in favor of Altus Baytown is appropriate on Hardy's § 161.134 claim.

## IV. CONCLUSION

In sum, Altus Baytown's motion for summary judgment is **GRANTED** in favor of ZT Wealth on all claims, **GRANTED** in favor of Altus Baytown on Hardy's (i) ADA discrimination; (ii) FMLA retaliation; (iii) FMLA interference; and (iv) § 161.134 claims, and **DENIED** with regard to Hardy's ADA failure to accommodate claim against Altus Baytown.

Signed at Houston, Texas on August 14, 2020.

Gray H. Miller
Senior United States District Judge

15